Cavanagh, P.J.
Respondent appeals as of right an order denying his motion to terminate the personal protection order (PPO) that was obtained ex parte against him by petitioner, acting through her conservator and limited guardian, Joelle Gurnoe. We reverse and remand for entry of an order granting the motion and for further proceedings consistent with this opinion.
On July 13, 2016, Gurnoe filed a petition for an ex parte domestic relationship PPO on behalf of petitioner as her limited guardian[1] and conservator. Gurnoe asserted that petitioner needed a PPO because she was a vulnerable adult with Alzheimer's and respondent had "exerted control over her and exploited her." Gurnoe alleged that respondent had been asked to stop, and he did for a while, but then he reinserted himself into petitioner's daily life and had changed passwords on petitioner's online accounts. Gurnoe requested that the PPO prohibit respondent from entering onto petitioner's property, stalking *917 petitioner, and accessing petitioner's online accounts.
The petition for a PPO was supported by Gurnoe's affidavit, which stated, in part, that the order appointing her as petitioner's limited guardian provided for powers that included protecting petitioner "from exploitation and manipulation from others," including Kathleen Baxter and respondent. Further, Gurnoe averred, respondent "has a history of predatory behavior in his relationship with" petitioner. And respondent was not complying with the directive to cease all contact with petitioner, as evidenced by telephone records and notes found in petitioner's home that petitioner had written referring to respondent. Gurnoe again alleged that respondent had accessed petitioner's online accounts and changed passwords.
The petition for a PPO was also supported by the affidavit of petitioner's son, Soren Windram. His affidavit stated that he was able to monitor petitioner's physical location through an app on her cell phone; the app indicated that she spent on average one to two nights a week at respondent's home. Soren also averred that he had a video chat with petitioner on one occasion in March 2015 while she was at respondent's home and petitioner was drinking a glass of wine and appeared intoxicated although she was an infrequent drinker. The next morning, Soren averred, petitioner broke into tears and said she thought she had sex with respondent and "she felt disgusted and embarrassed." Soren further stated that respondent had exploited petitioner's disease to alienate her from her family and, specifically, him by telling petitioner that Soren is not a good son, that he does not listen to her, and that he is trying to control her. Accordingly, Soren was in favor of the petition for a PPO against respondent.
On July 14, 2016, the ex parte domestic relationship PPO was issued and remained in effect until July 14, 2021.
On July 25, 2016, respondent filed a motion to terminate the PPO on the ground that false, erroneous, and distorted statements had been made against him, including that he is a predator and that he accessed petitioner's online accounts and changed passwords. Respondent alleged that the petition falsely presumed that petitioner was "so vulnerable as to not have the ability to exercise responsible agency and free will." And respondent referred to threats made against him by Soren and Gurnoe. Thereafter, the court conducted an evidentiary hearing on respondent's motion to terminate the PPO.
According to the testimony from a three-day evidentiary hearing, respondent and petitioner had met in the 1980s and then were reintroduced to each other by a mutual friend, Kathleen Baxter, in late 2014. At that time, petitioner was planning on going to North Carolina to visit her son, Soren, and respondent also was planning a trip to North Carolina, so they decided to travel there together. A friendship developed, which eventually became a romantic and sexual relationship. Petitioner had significant issues with her short-term memory but was functioning well enough to drive a vehicle and live alone. Respondent is a licensed certified social worker, certified financial planner, and a registered investment advisor. At some point, respondent had become aware that petitioner had substantial assets in a trust and offered his professional financial services, but the offer was rejected by Soren. Respondent never brought the matter up again and had nothing to do with petitioner's finances. There was no evidence that respondent ever received any substantial amount of money or significant gifts from petitioner. During the course of their relationship *918 they spoke on the telephone, took dance lessons, went out to dinner, and took petitioner's dog for walks around the lake. Respondent also introduced petitioner to yoga-and they took classes together-as well as massage therapy; these services were offered by two people that respondent had known for years.
At some point, Soren became concerned about his mother. Petitioner did not come to North Carolina to visit him and his family, and he believed it was because of the company that his mother was keeping. In other words, respondent as well as Baxter and others in petitioner's life were alienating her from him and his family. Soren testified that respondent made disparaging comments about him to petitioner and that those comments were destructive to Soren's relationship with petitioner. He also claimed that pictures he brought to petitioner's house would disappear. Soren testified that petitioner never told him that she felt intimated, threatened, or terrorized by respondent, but Soren felt that her relationship with respondent was emotionally damaging to petitioner. Soren also testified that petitioner began making suicidal statements related to these proceedings against respondent.
Gurnoe also testified that she heard petitioner say multiple times that if respondent were removed from her life, she would have nothing to live for and would kill herself. Gurnoe believed there was a concerted effort to alienate petitioner from Soren and his family who live in North Carolina. In fact, when Soren is discussed by petitioner and her friends, it is all about what Soren is doing behind petitioner's back and petitioner becomes very upset and angry. They have also made disparaging remarks about Gurnoe. And Gurnoe noticed that the passwords on petitioner's Verizon and Comcast accounts were changed, but Gurnoe admitted that she had no evidence that respondent was the person responsible.[2]
Gurnoe further testified that she had sent respondent a letter in January 2016, about six weeks after she became petitioner's limited guardian, and told him not to have any further contact with petitioner. Respondent did appear to abide by her request, including that no telephone calls were made for a period of time. However, eventually respondent resumed contact with petitioner, so the PPO was obtained. Gurnoe admitted that petitioner "gets violently angry when you talk about [the fact that] he's not allowed to have contact." However, Gurnoe testified, petitioner "doesn't have the option of choosing to be around people that manipulate her. That right has been taken away from her."
Respondent testified that he has never manipulated petitioner, that he never changed the passwords on any of petitioner's accounts, and that he never directed anyone to change her passwords. Respondent testified that he was in a consensual relationship, including a sexual relationship, with petitioner because she is "beautiful," "wonderful," and "a really, really fine companion." There was no question that petitioner needed support to function in life. Respondent did not believe that he was stalking petitioner. In fact, telephone records showed that petitioner called him too. He did not harass, threaten, or intimidate petitioner, nor was he benefiting in any way financially from their relationship. In fact, he would be willing to sign a document relinquishing any right to any *919 property or finances of petitioner. He had not influenced her in any negative way and never prevented her from going to North Carolina or from having a good relationship with her family. He simply wanted to be a part of petitioner's life and felt that he could be very helpful to her life and well-being.
Kathleen Baxter testified that respondent was indeed an important part of petitioner's life and that he was an honorable, not a manipulative, man. Baxter had known petitioner for over 40 years, and they called each other "sisters." Petitioner confided in Baxter that respondent is kind to her, gives her good information, and never tells her what to do. Petitioner wanted respondent in her life, and when she learned about the PPO, petitioner was very irate and tore it up when she saw it. Respondent simply wanted petitioner to have a voice, to be heard, and to be part of the decisions that keep her safe and happy. Despite her short-term memory issues, petitioner had never forgotten about respondent during these proceedings and still talked about him daily.
Petitioner testified that she never asked for a PPO to be taken out against respondent. "He's a wonderful human being, and I like to be able to talk with him, see him." She said she has fun with him. She characterized him as an "A plus" person. He had never caused her to feel frightened, intimidated, threatened, or in emotional distress. In fact, when she is with him she feels "happy, really happy. And enjoying whatever we're doing." When petitioner was asked if she told Gurnoe to keep him away, petitioner testified, "Absolutely I didn't-wouldn't want that to occur." If Gurnoe did that "I'd kick her out of the house and not ever use her as a person at all for-that would be terrible." Petitioner testified that she would be furious. Later, at the resumed evidentiary hearing, petitioner was again asked if she wanted a PPO against respondent, and she replied: "Heck no. Because he is not-he is not at all mean; he is quite wonderful. It would do me a lot of good to have him more hours doing things with me. He's a gentleman. He's a kind heart. ... [H]e's an A plus .... He's great. Best man I've ever met." As for Soren's claim that she was emotionally distraught after contact with respondent, petitioner testified that she thinks Soren made that up. She did not know why he would, but she would not put it past him.
After the testimony of Soren, Gurnoe, and respondent was received at the evidentiary hearing, respondent moved for a directed verdict, arguing that the statutory grounds required to issue a PPO were not proved by the evidence. Without providing any reasoning at all, the court denied the motion. Following all the testimony, the court held that a guardian was in place to protect petitioner and that the PPO would not be terminated. The basis for the court's ruling was that respondent continued to have contact with petitioner after he had been instructed by Gurnoe not to have contact. Therefore, on October 14, 2016, an order denying the motion to terminate the PPO was entered. Respondent moved for reconsideration, which was denied. This appeal followed.
Respondent first argues that Gurnoe exceeded the scope of her authority as petitioner's limited guardian by seeking a PPO against respondent, who was petitioner's boyfriend, when there was no evidence of manipulation or exploitation.
Issues involving the interpretation of statutes and court rules are reviewed de novo. Hill v. L F Transp., Inc. , 277 Mich. App. 500, 507, 746 N.W.2d 118 (2008).
It is undisputed that Gurnoe was appointed petitioner's conservator and limited guardian. The order appointing Gurnoe *920 as petitioner's limited guardian provided for powers that included protecting petitioner from the exploitation and manipulation of others, including respondent. Respondent argues that Gurnoe exceeded her authority as limited guardian because she was appointed under MCL 700.5306"as a means of providing continuing care and supervision ...." And, respondent argues, filing for a PPO against petitioner's boyfriend does not comport with those limited duties.
To the extent that respondent is challenging whether Gurnoe was properly performing or was breaching her duties as petitioner's limited guardian by seeking a PPO against respondent, respondent has failed to set forth any legal authority establishing his right to raise that challenge in this PPO action. And we could find no such authority. While respondent may challenge whether in fact the PPO should have been issued against him on the ground that the requirements for issuance under MCL 600.2950 were not established, a claim that Gurnoe breached her duties as petitioner's limited guardian by doing so may not be raised by him in this PPO action.
Further, to the extent that respondent is arguing that a personal protection action may not be filed on behalf of an incapacitated person, we reject that claim. MCR 3.703 provides the rules for commencing a personal protection action, and MCR 3.703(F)(1) states, "If the petitioner is a minor or a legally incapacitated individual, the petitioner shall proceed through a next friend." A "next friend" represents a petitioner under supervision of the trial court; however, when a conservator has already been appointed by the probate court, the conservator may bring such an action on behalf of the incapacitated person. MCL 2.201(E)(1)(a) and (b) ; see also In re Powell Estate , 160 Mich. App. 704, 713, 408 N.W.2d 525 (1987). Accordingly, Gurnoe was permitted to commence a personal protection action on behalf of petitioner as her conservator.
Next, respondent argues that the circuit court erred when it denied his motion for a directed verdict at the close of petitioner's proofs at the evidentiary hearing or, in the alternative, when it denied his motion to terminate the PPO. We agree.
A PPO constitutes injunctive relief. MCL 600.2950(31)(d). We review decisions to grant or deny injunctive relief, including the decision to deny a respondent's motion to terminate a PPO, for an abuse of discretion. Hayford v. Hayford , 279 Mich. App. 324, 325, 760 N.W.2d 503 (2008). An abuse of discretion occurs when the court's decision falls outside the range of principled outcomes. Id . The circuit court's factual findings underlying its decision are reviewed for clear error, and issues of statutory interpretation are reviewed de novo. Id . A circuit court's decision to deny a motion for a directed verdict is reviewed de novo to determine whether, after the close of the petitioner's proofs, the petitioner had shown a right to relief. Samuel D Begola Servs., Inc. v. Wild Bros. , 210 Mich. App. 636, 639, 534 N.W.2d 217 (1995).
A domestic relationship PPO is issued under MCL 600.2950(1), which provides, in pertinent part:
Except as provided in [ MCL 600.2950(27) and (28) ], by commencing an independent action to obtain relief under this section ... an individual may petition the family division of circuit court to enter a personal protection order to restrain or enjoin ... an individual with whom he or she has or has had a dating relationship ... from doing 1 or more of the following:
*921 (a) Entering onto premises.
(b) Assaulting, attacking, beating, molesting, or wounding a named individual.
(c) Threatening to kill or physically injure a named individual.
(d) Removing minor children ....
(e) Purchasing or possessing a firearm.
(f) Interfering with petitioner's efforts to remove petitioner's children or personal property from premises ....
(g) Interfering with petitioner at petitioner's place of employment ....
(h) Having access to information in records concerning a minor child ....
(i) Engaging in conduct that is prohibited under section 411h or 411i of the Michigan penal code, 1931 PA 328, MCL 750.411h [stalking] and 750.411i [aggravated stalking].
(j) Any of the following ... with respect to an animal in which petitioner has an ownership interest ....
(k) Any other specific act or conduct that imposes upon or interferes with personal liberty or that causes a reasonable apprehension of violence.
Under MCL 600.2950(4), a PPO must be issued "if the court determines that there is reasonable cause to believe that the individual to be restrained or enjoined may commit 1 or more of the acts listed in subsection (1)." The burden of establishing reasonable cause to issue a PPO is on the petitioner, who also bears the burden of justifying its continuance at a hearing on a motion to terminate the PPO. Hayford , 279 Mich. App. at 326, 760 N.W.2d 503.
In this case, Gurnoe's petition for an ex parte PPO filed on behalf of petitioner and against respondent stated that a PPO was needed because:
Ms. Windram Brown is a vulnerable adult with Alzheimer's. Mr. Rudy has exerted control over her and exploited her. He has been asked to stop, and did for a while. Now he has changed the passwords on her accounts and has reinserted himself into her daily life. Petitioner is both Co-Guardian and Conservator for Ms. Windram Brown.
As permitted under MCL 600.2950(4)(a), the petition was also supported by the affidavits of Gurnoe and Soren, which were discussed earlier. However, it is unclear what specific violent, threatening, or harassing prohibited act identified in MCL 600.2950(1) Gurnoe claimed respondent committed or may commit against petitioner warranted the issuance of a PPO. See, e.g., Kampf v. Kampf , 237 Mich. App. 377, 385, 603 N.W.2d 295 (1999). Likewise, it is not clear what imminent danger warranted the issuance of an ex parte PPO. See MCL 600.2950(12).
According to Gurnoe and Soren, respondent "exerted control over" petitioner, exploited and manipulated her, had a sexual relationship with her, and had "a history of predatory behavior in his relationship" with her. But not one of these acts is listed in Subsection (1). See MCL 600.2950(4). To the extent that the purported "predatory behavior" can be construed to mean the prohibited conduct of "stalking," i.e., "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested," MCL 750.411h(1)(d), no such harassment was identified in either the petition or supporting documents seeking the PPO. Furthermore, Gurnoe was only appointed as petitioner's "limited guardian," which means that petitioner was found to have some capacity to take care of herself. See MCL 700.5306(3). And Gurnoe was appointed as *922 petitioner's conservator to protect petitioner's finances. MCL 700.5319(1). Nevertheless, the circuit court concluded that there was reasonable cause to believe that respondent committed or would commit one of the violent, threatening, or harassing prohibited acts listed in Subsection (1) and issued the ex parte PPO. See MCL 600.2950(4) and (12) ; Kampf , 237 Mich. App. at 385, 603 N.W.2d 295.
After respondent moved to terminate the PPO, a three-day evidentiary hearing was conducted. During the course of that hearing, the evidence clearly demonstrated that petitioner's son Soren attributed petitioner's failure to visit or move to North Carolina to the influence, i.e., "manipulation," of her "circle of friends," which included petitioner's best friend of over 40 years, Baxter, as well as petitioner's boyfriend, respondent. That petitioner had her own life and her own friends that she enjoyed in Michigan apparently could not have been a reason petitioner chose not to move from her home to North Carolina. Despite the fact that petitioner threatened suicide if she could not continue in her relationship with respondent, Soren was not persuaded; apparently, he believed petitioner's feelings were the product of some "undue influence" by respondent. It was also clear from Soren's testimony that the sexual relationship petitioner had with respondent was repulsive to him and, he testified, to petitioner. After Soren's testimony, however, petitioner accused Soren of lying in an outburst in the courtroom. And when petitioner testified, she was not queried about her sexual relationship with respondent. But when asked if she was emotionally distraught after having had contact with respondent, petitioner testified that Soren made that up and that she would not put it past him to do so. Further, no evidence was presented that petitioner's intimate relations were not consensual. In any case, Soren's testimony did not give rise to reasonable cause to continue the PPO against respondent.
The testimony offered by Gurnoe also did not give rise to reasonable cause to continue the PPO against respondent. Again, petitioner was adjudicated to have some capacity to take care of herself, so Gurnoe was appointed only as a limited guardian. Pursuant to MCL 700.5314, as petitioner's guardian, Gurnoe had the duty to consult with petitioner before making a major decision affecting petitioner. It would seem that seeking a PPO against petitioner's boyfriend-whom petitioner clearly and adamantly cared about-would be such a "major decision." That is, Gurnoe admitted that petitioner threatened multiple times to kill herself if respondent was removed from her life. And Gurnoe testified that petitioner "gets violently angry when you talk about [the fact that] he's not allowed to have contact." Apparently, as with Soren, Gurnoe ignored petitioner's sentiments and attributed them to some "undue influence" by respondent rather than petitioner's true feelings for him.
Likewise, Gurnoe considered all of petitioner's "circle of friends" to be threats to petitioner's well-being, including Baxter-who was like a sister to petitioner and had been for over 40 years-petitioner's yoga instructor, petitioner's massage therapist, and respondent. The apparent "threats" to which Gurnoe refers include attempts to alienate petitioner from Soren and his family, the fact that disparaging remarks were made about Gurnoe and were overheard by Gurnoe, and that the passwords on two of petitioner's online accounts were changed-although Gurnoe admitted that she had no idea who changed the passwords despite accusing respondent of doing so in the petition for the PPO. With regard to respondent specifically, Gurnoe's concern was that "he does not recognize *923 [petitioner's] limitations or have a realistic view of what her future will be or what her future costs of care will be." According to Gurnoe, petitioner has a home in North Carolina, her burial plot is there, and her family is there; therefore, that is where petitioner belongs. The fact that petitioner's "circle of friends" do not promote that objective is apparently considered threatening, manipulative, or exploitive to Gurnoe. In her attempt to achieve the objective of petitioner moving to North Carolina where she "should be," Gurnoe has taken concerted-and legal-actions to remove all of petitioner's friends and support system from petitioner's life, in effect isolating her, so that petitioner would have no reason not to move to North Carolina.
In any case, Gurnoe's testimony did not support her claims that respondent "exerted control over" petitioner, exploited her, or manipulated her. And there was no "predatory behavior." While Gurnoe testified about telephone calls respondent made to petitioner, there were also numerous telephone calls petitioner made to respondent. In other words, they mutually sought to speak to each other on the telephone, as friends generally do. Gurnoe's testimony certainly did not give rise to reasonable cause to believe that respondent committed or would commit any of the violent, threatening, or harassing prohibited acts listed in MCL 600.2950(1).
Respondent testified after Gurnoe and then moved for a directed verdict. The circuit court denied the motion without explanation. We conclude that the decision to deny respondent's motion for a directed verdict was erroneous. Petitioner, acting through her limited guardian and conservator, Gurnoe, bore the burden of demonstrating that respondent committed or would commit one or more of the violent, threatening, or harassing prohibited acts listed in MCL 600.2950(1) and wholly failed in that effort. Even if exerting control over, exploiting, and manipulating were considered prohibited acts under Subsection (1), which they are not, the evidence did not establish that respondent engaged in these behaviors. Accordingly, for all the reasons discussed in this opinion, the circuit court erred by denying respondent's motion for a directed verdict because not one of the statutory grounds required to issue a PPO was proved by petitioner's evidence.
Further, the testimony received by the circuit court after it denied respondent's motion for a directed verdict should have given the court even more reason to terminate the PPO. Petitioner's friend of 40 years, Baxter, whom petitioner considered a sister, testified that petitioner had told her repeatedly that respondent is important to her and that she wanted him in her life. Baxter further testified that despite petitioner's short-term memory issues, she has never forgotten about respondent even though they had not been allowed to see each other since the PPO was issued. In fact, petitioner still talked about respondent on a daily basis. The testimony from petitioner herself confirmed that she remembered respondent, sincerely cared about respondent, and held him in the highest regard. Petitioner clearly testified that she wanted to be able to see respondent, talk to respondent, and spend time with respondent. She expressed absolutely no fear or apprehension of any kind with regard to respondent and, in fact, characterized him in the most glowing of terms.
Nevertheless, the circuit court denied respondent's motion to terminate the PPO, holding that the PPO was warranted because respondent defied Gurnoe's instruction not to have contact with petitioner. The circuit court's decision constituted an abuse of discretion. See Hayford , 279 Mich.App. at 325, 760 N.W.2d 503.
*924 MCL 600.2950(1) sets forth very specific violent, threatening, and harassing behaviors that warrant the issuance of a PPO. A PPO is not to be sought or issued on a whim or because someone simply does not like someone else and makes reckless statements to support a fiction. And in this case, it was clear that the PPO was sought as a means to control petitioner moreso than to control respondent. In any case, defiance of the instruction of a limited guardian is not a statutory ground to issue a PPO under MCL 600.2950(1). And the evidence wholly failed to establish reasonable cause to believe that respondent committed or would commit any conduct prohibited under MCL 600.2950(1) that would warrant the issuance of a PPO. See MCL 600.2950(4). In light of our resolution of this matter, we need not consider respondent's other argument on appeal. Furthermore, because of the manner in which Gurnoe handled this matter, as well as the antagonistic relationship between Gurnoe and petitioner, we direct the circuit court to consider the removal of Gurnoe as petitioner's guardian. See MCR 7.216(A)(7).
Reversed and remanded for entry of an order granting respondent's motion to terminate the PPO and for further proceedings consistent with this opinion. We do not retain jurisdiction. Respondent is entitled to tax costs as the prevailing party. See MCR 7.219(A).
Hoekstra, J., concurred with Cavanagh, P.J.

The order appointing a guardian dated December 4, 2015, provided that petitioner was only partially without the capacity to care for herself; therefore, only a limited guardianship was ordered.

In fact, petitioner's massage therapist testified that she was there when petitioner was assisted by Verizon in changing her account password. Further, a person who was paid to help petitioner with daily financial matters testified that she had changed the Comcast account password.